[No. 1849.]

H. H. Lawson *v.* The State.

1. Rape — Indictment.— Various means used in committing an offense, when alleged conjunctively, do not render the indictment duplicitous. Carnal intercourse obtained without the consent of the female, in either of the three modes named in the statute, *i. e.*, force, threats and fraud, constitutes rape, and the rape may be accomplished by all three modes combined. It is not, therefore, a valid objection that the indictment, in the same count, charges the commission of the rape by the three several means.

2. Same — Evidence.— It is a settled rule of evidence in this State that, while in prosecutions for rape the general character of the alleged injured female for chastity may be shown to be bad, not in justification of the offense, but as weakening the evidence of the prosecution as to the want of consent, yet, it is not admissible to prove particular instances of unchastity, except with the defendant. Evidence, therefore, that the alleged injured female had, prior to the alleged rape, been guilty of illicit carnal intercourse with another man, was properly excluded.

3. SAME.— However specious the argument that the alleged injured female's
voluntary prostitution of her person to other men than the defendant, should
be admitted in mitigation of punishment, if for no other reason, it is a doc-
trine which does not obtain in this State.

4. SAME.— When, in prosecutions for rape, the guilt of the accused is made to
depend solely upon the testimony of the alleged injured female, every rea-
sonable test should be applied to her integrity, and while unreasonable sus-
picion should not be indulged against her, she is entitled to no sympathy in
the scrutiny of her testimony. "Hence," it has been held in this State, "the
failure to make outcry, or call for aid when it might have been readily ob-
tained, or within reasonable time to discover the offense after an opportunity
to do so, are circumstances tending to discredit her testimony. But if the
absence of these circumstances tends to raise the presumption that her tes-
timony is false or feigned, proof of them repels the suspicion which their
absence raises. It has therefore been universally held that recent complaint
by the person injured, her state and appearance, marks of violence and the
condition of her dress, shortly after the alleged occurrence, may be proved
as original evidence. But proof of the particulars of such complaint, and
the detailed statement of the alleged facts and circumstances connected
with it, cannot be admitted as original evidence to prove the truth of the
statements testified to by the injured party, or to establish the charge made
against the accused party. Their admissibility on behalf of the State is
limited to the purpose, in rebuttal, of supporting the veracity and establish-
ing the accuracy of the testimony of the prosecuting witness." In this case
the prosecutrix, upon her examination in chief, was allowed to state not
only that she had made complaint of the outrage committed upon her, but
also to state the particulars and details of such complaint. But not being
excepted to at the proper time, such error is not revisable.

5. SAME.— Two witnesses for the State were permitted to testify that, five days
after the alleged rape, in company with the prosecutrix, they went to the
place where the alleged outrage was said, by the prosecutrix, to have oc-
curred, and saw the weeds, grass and corn stalks disarranged, as well as
other indications that persons had been lying upon the ground. Held, in
view of the circumstances of this case, as disclosed by the evidence, the ad-
mission of such evidence was error, even to corroborate the prosecutrix;
and, moreover, it was too remote and uncertain in character to have any
legitimate bearing upon the issue, while, at the same time, it was well cal-
culated to prejudice the defendant.

6. SAME — FACT CASE.— See the statement of the case for evidence held insuffi-
cient to sustain a conviction for rape.

APPEAL from the District Court of Ellis. Tried below before the
Hon. G. N. Aldredge.

The conviction in this case was for the rape of Lucinda Lawson,
in Ellis county, Texas, on the 3d day of September, 1884. A life
term in the penitentiary was the penalty assessed against the appel-
lant, who was the father of Lucinda.

Lucinda Lawson was the first witness for the State. She testified
that she was the daughter of the defendant, and lived with him

near the town of Ferris, in Ellis county, where he had lived for two years. The witness was verging on her eighteenth birth-day. Soon after breakfast, on or about the 1st day of September, 1884, the witness, her little sister Eugenie and the defendant went to the field, some two hundred yards distant from the house, to get some corn. When Eugenie's sack was filled, the defendant told her, Eugenie, to take it and go to the house. Before Eugenie had accomplished any great distance on her return to the house, the defendant caught the witness, threw her down, and had forcible carnal knowledge of her person. He first caught the witness around the waist and threw her down. His pants were then open in front. He then caught her by the throat with one hand and choked her. With his other hand he pulled up the witness's clothes, took hold of one of her legs, and with one knee pressed against the witness's other leg, he got between her legs, lay down on her body, and, without her consent, inserting his male member in her private parts, had forcible carnal intercourse with her. The defendant then drew his knife, and told the witness that he would cut her throat if she reported his conduct, and the witness promised that she would not tell. She then jerked loose from the defendant and ran home, calling out to the defendant that she was going to have him punished.

Continuing her testimony, the witness stated that she cried out twice before the defendant succeeded in throwing her down. Just before the witness reached home, on her flight from the scene of her outrage, she met her mother, who asked her if her father, the defendant, had been " playing thunder" again. To this inquiry the witness answered " Yes." Reaching home, the witness took her dinner bucket, and, in company with her sister Eugenie, went to Mr. Wardlow's, where she had been picking cotton for some time. *En route* she encountered Martha Reid, who, seeing the witness weeping, asked her what was the matter. Witness told her, in reply, that she would tell her some time. Leaving her bucket at Mr. Wardlow's house, the witness, still weeping, went to the cotton field with Martha Reid and Eugenie, and, when she reached the field, she told the said Martha that her father, the defendant, had thrown her down and ravished her. About 9 or 10 o'clock that morning, the witness went down to Mr. Wardlow's house, and told Mrs. Wardlow that her father, the defendant, had thrown her down in the corn field and ravished her; that he had treated her like a negro, and that she would not return home again, but would leave it forever. That evening, after Eugenie had gone home, she was sent back after the witness, by the witness's mother. When the witness

reached home she told her mother that her father, the defendant, had treated her like a dog; that he had thrown her down in the corn field and ravished her. The witness's mother advised the witness to say nothing about it, adding that it would do no good to tell it. Witness remained at home all that night, and next morning went back to Wardlow's to pick cotton, and remained there all day. She did not go back home that night. When the defendant choked the witness he hurt her and marked her neck with his hand, which marks she carried for several days.

Cross-examined, the witness stated that the defendant was very angry with her on the morning of the outrage, as he always was. He was invariably vicious towards her, always treating her with extreme severity. The witness denied that, on the road from her house to Mr. Mahundro's, a few days after the outrage, she told Fred Bryant that she would swear against her father and have him sent to the penitentiary, because he had always treated her meanly, had never given her nice clothes and let her go to balls, parties and meetings like other girls. She denied that in the spring, at the defendant's house, she told young Mr. Mahundro, in the presence of his father, John Mahundro, that she could not get to go to any more parties because her father was jealous of her and would not permit her to go; but that such would not long be the case, as she intended to get rid of him, her father, and do as she pleased. She denied that she told her sister Eugenie, at home, during the fall, that she would place her father behind the bars because he would not get her nice clothes and let her go to parties with the boys, like other girls. She denied that, on Christmas, 1883, she told Eugenie that she and Willis O'Brien would have run away and married, had it not been for her father, but that she would put her father behind the bars, where all dogs ought to be, and then marry O'Brien. She did not tell Eugenie that she would marry O'Brien, if he remained in his then state of mind, as by so doing she would get rid of her father. She did not, some two months before this trial, during the sickness of her mother, tell Eugenie that she intended to marry O'Brien. O'Brien had not been to see the witness, nor had he waited on the witness since some time before Christmas, 1883, when the defendant forbade the witness having any communication of any kind with O'Brien. O'Brien was not at the defendant's house two months prior to this trial, when witness's mother was sick, nor at any other time since before Christmas, 1883. Witness's mother did not appeal to O'Brien to leave the house for her sake, saying that it would anger the defendant to find him there, nor did Eugenie add her appeals to her mother's for O'Brien to leave.

The witness also denied that on the day before the outrage she told Eugenie that she, witness, did not care if her father was angry with her for sending by Mr. Wardlow to Dallas for a hoop-skirt, nor did she then complain to Eugenie that her father did not dress her like other girls, and let her go about like other girls. She did not tell Eugenie that O'Brien and two other young men had promised to dress and take care of her if she would get her father out of the way, and that they had already given her some money. She denied that, a few days after the outrage, in the presence of Eugenie, she denounced her mother as a liar, and told her that the Reids and Wardlows had promised to take care of her if she would swear against her father; nor did she then say that her father was an old devil, of no account, and that she would do better without him. Witness could not read. She did not know the months of the year, nor did she know the month during which this trial was had. She had never had carnal knowledge of Charles Johnson, or any other man.

Mrs. Wardlow was the next witness for the State. She testified that on September 3, 1884, the day of the alleged outrage, Lucinda and Eugenie Lawson, Martha Reid and another girl came together to the witness's place to pick cotton, arriving while the family, save witness's husband, who was in Dallas, were at breakfast. After the usual morning salutations, they left their dinner buckets at the house and went to the cotton field. Between 10 and 11 o'clock, Lucinda came back to the house, and commencing to weep, said that she was going to leave home. Witness then asked her why she was going to leave her home. She replied that her father had treated her like a negro; that, while out in the field after corn that morning, her father put his arm around her, threw her down, and tried to ravish her, and that she broke loose from him and ran home. Lucinda remained at the house until after dinner, when, with the other girls, she returned to the cotton field. About two hours later she came back to the house, said she felt quite ill, and lay the rest of the evening on some cotton. Later in the evening she said that she would stay at the witness's house all night, and Eugenie went home alone. After some little time, Eugenie returned to the witness's house and told Lucinda that her mother had sent for her. Lucinda went home. On the 5th day of September, the witness went to the defendant's house and saw Mrs. Lawson for a few minutes before she, Mrs. Lawson, went off to call on a neighbor. Nothing was said about the alleged outrage while Mrs. Lawson was at home. Lucinda and the witness then went to the corn field, and the witness was shown the place where the outrage was said to

Statement of the case.

have been committed. The grass and nettles were pressed down and the witness saw a corn stalk that had been pulled up.

W. C. Wardlow was the next witness for the State. He testified that he was in the city of Dallas on the day that the outrage on Lucinda Lawson was alleged to have been committed. On his return to his home near the defendant's house, he was shown and exan ; the place of the alleged outrage. The grass and nettles on tha )lace were mashed down, and a razed corn stalk was lying near. A distinct impression, about six feet long and about two or two and a half feet wide, extended diagonally across the rows. This impression was not, and could not have been, made by dragging a corn sack across the rows. It must have been made by some person, and could not have been made otherwise. Witness discovered the impression of toes. The ground on which corn had been cultivated was very hard. Lacy, Reid, witness and others guarded the defendant's house all of Thursday night, and arrested the defendant before day next morning. This party went up to defendant's house armed, and demanded the surrender of the defendant, commanding him to throw up his hands. Defendant called out that his hands were up, and asked the party not to shoot. Defendant was then taken to a gin, some two hundred yards distant. Some of the party advocated the summary execution of the defendant, which proposition the witness opposed. Constable Roach arrived at the gin about daylight, and the defendant was turned over to him.

Lawson Reid testified, for the State, that he was horse hunting in his pasture on the morning of the alleged outrage. This pasture and the defendant's corn field adjoined. Witness saw Eugenie Lawson going towards the defendant's house with a sack of corn, and shortly afterwards heard Lucinda halloo twice, distinctly. About twenty minutes after Eugenie passed, the witness saw Lucinda running home. Witness did not see the defendant. In going home Lucinda passed the witness's house, which was not her most direct route home. She did not stop at the witness's house. The State rested.

Fred Bryant was the first witness for the defense. He testified that on the road from defendant's house to Mr. Mahundro's, a few days after the alleged commission of the outrage, Lucinda Lawson told him that she would swear against her father and have him put in the penitentiary, because he had always treated her meanly, would never buy her nice clothes and let her attend balls, parties and meetings, like other girls. Witness was in no way related to defendant.

John Mahundro testified, for the defense, that during the spring preceding this trial, he was at the house of the defendant in company with his son. He heard Lucinda tell his son that she could not go to any more parties, because her father was jealous of her and would not permit her to go, but that he would not always have her under his thumb, for she would get rid of him and do as she pleased.

Eugenie Lawson testified, for the defense, that, on the morning of the alleged outrage, she, her sister Lucinda, and her father, the defendant, each taking a sack, went to the field, about two hundred yards from the house, to get corn for the hogs, and for the defendant to take with him on a projected trip to Waxahatchie. When the witness got as much corn in her sack as she felt inclined to carry, having a sore foot, her father told her she might go on to the house. She started, leaving Lucinda and the defendant filling their sacks. Witness had gone about sixty feet when she found a bird's nest. While looking at this nest, she saw Lucinda coming with the sack of corn. Witness went on home with her sack of corn. Lucinda followed direct, and at no time was out of witness's sight, nor farther in the rear than seventy feet. Within a minute after Lucinda reached the house, she threw down her sack of corn, got her bonnet and dinner bucket, and she and witness went at once to Mr. Wardlow's to pick cotton. From Wardlow's house the two went to the cotton field. Lucinda did not utter a single word of complaint against the defendant at the defendant's house, in his field, or on the way to Wardlow's, nor did she weep any during that time. On the contrary, she was laughing and talking as usual all of the time until she went to Wardlow's house from his cotton field, between 10 and 11 o'clock that day. Lucinda was the first of the cotton-picking party who started to Wardlow's house, and she reached the house about the time the others started from the field. The witness worked near Lucinda in the field all of that day, but heard her make no complaint whatever to anybody about bad treatment at the hands of the defendant. She first heard of this charge through Mrs. Wardlow.

This witness further declared that she heard nothing of the screams Lucinda claimed to have uttered when she was assaulted by the defendant on that morning, and she felt certain that, had Lucinda screamed as she claimed, she, the witness, would have heard her. When the witness and Lucinda, a minute or two apart, reached home from the corn field on the morning of the alleged outrage, their mother was cleaning up the house, and washing the cooking

utensils. Lucinda said nothing about the rape or attempted rape. In the evening of that day witness went home from Wardlow's alone, and told her mother that Lucinda had told Mrs. Wardlow that her father, the defendant, had attempted to ravish her, and that she, Lucinda, was going to stay all night at Wardlow's. Witness was sent by her mother to tell Lucinda to come home. Lucinda returned with witness and told her mother that her father had tried to ravish her.

Cross-examined, the witness stated that she had only related her knowledge of this case to Mr. McKnight and her mother. She talked to her mother about it on the Saturday and Thursday nights preceding this trial. Witness denied that, some time after the alleged outrage, she told Martha Reid that she left the corn field long before Lucinda did, and that she heard Lucinda scream twice. She denied that she made the same statement to Mrs. Moseley on the second Monday prior to this prosecution, and that she said to Mrs. Moseley, in the same connection, that her mother told her to say that it was not Lucinda, but some of the other children who screamed. She did not tell Mrs. Crouch at Mrs. Crouch's house, on the second Friday prior to this trial, that she, witness, would swear a lie to save her father. She did not, in the presence of Mr. and Mrs. Wardlow, Mrs. Moseley and others, on September 18, 1884, at dinner on Red Oak Creek, say that she would swear to anything for her father.

Re-examined by the defense, the witness stated that she regarded the Wardlows, Moseleys and their people as enemies to herself and her father, and that she did not have a friend among them. The parties mentioned were in no wise related to witness, and all of them were prosecuting witnesses. Witness and Lucinda traveled to and from court in different wagons.

Mrs. M. L. Lawson, the wife of the defendant, testified that the corn field to which the defendant, Lucinda and Eugenie went on the occasion of the alleged outrage, was in full view of the defendant's house where the witness was at work, and about equally distant from the houses of Moseley, Reid and Crouch. Eugenie was the first to return to the house. Lucinda arrived within a minute afterwards, and was immediately followed by the defendant. Lucinda and Eugenie left almost immediately, going to Wardlow's to pick cotton. The defendant left shortly afterwards, with a wagon, going to Waxahatchie with a load of posts. About sundown Eugenie returned alone and informed the witness that Lucinda had accused her father to Mrs. Wardlow of an attempt to rape her that morning

in the corn field.  Witness dispatched Eugenie with orders to Lucinda to return home immediately.  When she reached home, the witness asked Lucinda what it was she had been telling Mrs. Wardlow about her father.  She replied that she told Mrs. Wardlow that her father caught hold of her in the morning and tried to ravish her; that she broke loose from him, struck him in the face and ran home, and that the defendant threatened to cut her throat if she told it.  Lucinda spent that night at home and returned to her cotton picking at Wardlow's next morning.  She has not spent another night at home.

The defendant returned home from Waxahatchie on the second night after the alleged rape.  About 3 o'clock next morning the witness was aroused from her sleep by persons around the house calling on the defendant to throw up his hands.  They ordered him to "throw up your hands, d—n you; throw them up quick."  Defendant, going towards them with his hands raised, told them his hands were up, and asked what they wanted.  These men had their guns drawn on the defendant.  No one told defendant what they wanted with him, but took him off to a cotton gin, about three hundred yards distant.  After some time, Constable Roach came and asked the witness where the defendant was.  She replied that he had been taken off toward the gin, and, she supposed, had been killed by that time.  About daylight, Roach came back to the house with the defendant, and the witness, as directed by the defendant, gave the parties a drink of whisky.  Roach told the defendant that he would have to take him, defendant, to Waxahatchie.  Defendant then gave the witness directions about the stock, etc.  Witness, who had never told the defendant about the charge against him, told him then that she and the children had always loved him.

About three months prior to this trial, during an illness of the witness, one Willis O'Brien came to the defendant's house.  The witness, telling O'Brien that she feared the defendant would be angry if he found him on his place, asked him to leave.  O'Brien was then in conversation with Lucinda on the outside of the house.  A few days after the alleged rape the witness told Lucinda that she ought to come home; that home was the proper place for her.  Lucinda replied that the witness was a liar; that the Reids, Wardlows, and others, with whom she had been staying, had promised to take care of her if she would swear against her father; that her father was an old devil, was of no account, and that she could do better without him.

Cross-examined, this witness stated that Eugenie did not tell her

what she knew about this transaction either on Thursday or Saturday night, or any other time. Re-examined by the defense on this point, the witness stated that Eugenie did tell her on several different occasions what Lucinda told her, Eugenie. In denying this to the county attorney the witness understood his question to apply to what Eugenie *knew* about the alleged assault, and not what Lucinda had *told* Eugenie about it. Eugenie did, on several occasions, repeat to her Lucinda's statements to her, Eugenie, about it.

J. H. Roach testified that he went, as constable, to arrest the defendant on the second night after the alleged outrage. Witness found the defendant at a cotton gin, about three hundred yards from his house, surrounded by twelve or fifteen armed men, some of whom were threatening to take defendant's life. None of these men were officers, and neither they nor witness had a *capias* for the arrest of defendant. Defendant did not appear to know the cause of his arrest until the witness told him, when he said that he was not guilty. Witness complied with defendant's request to take him by home, where all of the party were given a drink of whisky. Defendant then told his wife of the charge against him, and she replied to him that she and her children had always loved him.

Martha Reid was introduced by the State, in rebuttal. She testified that in the cotton field, on the day of the alleged outrage, Eugenie Lawson told her that she left the corn field that morning some time before Lucinda did, and that she heard Lucinda scream. The witness was present at this trial as a witness for the prosecution.

Mrs. Moseley, in rebuttal, for the State, testified that at her house, on the second Monday before this trial, Eugenie Lawson told her that she left the corn field before Lucinda did; that she heard Lucinda scream, and that her mother told her to say that it was not Lucinda, but some one of the other children who screamed. Witness was present at this trial on behalf of the State.

Mrs. Crouch, in rebuttal, testified for the State that, at her house, on the second Friday prior to this trial, Eugenie Lawson told her that she, Eugenie, would swear a lie to save her father. While at dinner on Red Oak Creek, on September 18, 1884, in the presence of Mr. and Mrs. Wardlow, Mrs. Moseley, witness and others, Eugenie said that she would swear anything for her father. Mr. and Mrs. Wardlow and Mrs. Moseley, each in rebuttal for the State, corroborated Mrs. Crouch as to Eugenie's statement on Red Oak Creek.

The motion for new trial asserted error in the court's refusal to

quash the indictment; in refusing a continuance; in its organiza-
tion of the jury; in admitting illegal and excluding legal evidence;
in failing to define to the jury an assault with intent to rape, and
denounced the verdict as unsupported by law and evidence.

*Bradshaw & McKnight* and *J. E. Lancaster*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

Willson, Judge. I. It is no valid objection to the indictment
that it charges, in the same count, the commission of the rape by
the three several means named in the statute, force, threats and
fraud. Either of the three modes of obtaining carnal knowledge
of a female without her consent constitutes rape, and the rape may
be accomplished by all three of the modes combined. (Penal Code,
art. 528.) Various means used, in committing an offense, when
alleged conjunctively, do not make the indictment duplicitous.
(Whart. Cr. Pl. & Prac., § 254; Whart. Cr. Ev., § 134; *Mayo* v. *The
State*, 7 Texas Ct. App., 342.)

II. It is too well settled in this State to admit of question or dis-
cussion that, while the general character for chastity of the alleged
injured female may be shown to be bad, not in justification of the
offense, but as weakening the evidence of the prosecution as to
want of consent, yet, it is not admissible to prove particular in-
stances of unchastity, except with the defendant. (*Pefferling* v.
*The State*, 40 Texas, 486; *Dorsey* v. *The State*, 1 Texas Ct. App., 33;
*Rogers* v. *The State*, Id., 187; *Jenkins* v. *The State*, Id., 346; *Mayo*
v. *The State*, 7 Texas Ct. App., 342.) It was therefore not error to
reject the evidence offered by the defendant to prove that Lucinda
Lawson had, prior to the alleged rape, been guilty of illicit carnal
intercourse with another man. Counsel for appellant argue plausi-
bly that such testimony should be admissible in mitigation of the
punishment, if for no other reason. We concede the force and ap-
parent justice of the argument, and while in some of the States it
has been adopted as the rule, still, the great weight of authority, and
the decisions in our own State, are the other way.

III. In prosecutions of this character, where the fate of the ac-
cused depends solely upon the testimony of the alleged injured
female, every reasonable test should be applied to her integrity.
While no unreasonable suspicion should be indulged against her on
trial, courts and juries should be cautious in scrutinizing her testi-
mony, and guarding themselves from sympathy on her behalf.
" Hence, the failure to make outcry, or call for aid when it might

have been readily obtained, or within reasonable time to discover the offense after an opportunity to do so, are circumstances tending to discredit her testimony. But if the absence of these circumstances tends to raise the presumption that her testimony is false or feigned, proof of them repels the suspicion which their absence raises. It has, therefore, been universally held that recent complaint by the person injured, her state and appearance, marks of violence, and the condition of her dress, shortly after the alleged occurrence, may be proved as original evidence. But proof of the particulars of such complaint, and the detailed statement of the alleged facts and circumstances connected with it, cannot be admitted as original evidence to prove the truth of the statements testified to by the injured party, or to establish the charge made against the accused party. Their admissibility on behalf of the State is limited to the purpose, in rebuttal, of supporting the veracity and establishing the accuracy of the testimony of the prosecuting witness." (*Pefferling* v. *The State*, 40 Texas, 486; 1 Whart. Cr. Law, §§ 565, 566.) In this case, the prosecutrix, upon her examination in chief, was allowed to state not only that she had made complaint of the outrage committed upon her, but also to state the particulars and details of such complaint. This was an irregularity which, if objected to, the learned trial judge would not have countenanced, but no exceptions were interposed by the defendant, and the error is not before us for revision.

It appears from the testimony of the prosecutrix that the rape occurred in defendant's corn field, not far from his house, and in the daytime. Her sister was near to the place at the time, within calling distance. When the defendant caught hold of her she says she cried out twice before he threw her down, but did not cry out any more. She does not give any reason for not continuing to cry out, except that defendant choked her after he got her down upon the ground. Her sister, who was not far off at the time, testified that she heard no outcry, and no noise of any kind. A witness who was in an adjoining field, however, testified that he heard the prosecutrix scream twice in defendant's field about the time and place the rape is said to have been committed, and soon afterwards saw her running toward the house. When she reached home, where her mother and sister were, she said nothing to them about the occurrence in the field, but went with her sister to a neighbor's to pick cotton, and after she had been at this neighbor's house several hours she told the lady of the house that defendant had attempted to rape her. She said nothing to her mother about it, until ques-

tioned in regard thereto. She testified that when defendant choked her, he marked her neck with his hand and hurt her, and she carried the mark for several days. No witness testifies, however, to having seen any marks or indications of violence whatever upon her person. She was about eighteen years old at the time of the alleged rape, but the record does not disclose anything as to her size, or strength, nor as to the age or strength of the defendant.

On the 'fifth day after the alleged rape, the prosecutrix went with the neighbor lady above referred to, to the corn field and pointed out the place where she said the rape had been committed, and this lady testified, as also did her husband, who also examined the place, that the grass and weeds were mashed down, and that a corn stalk had been pulled up, and that there were other indications that persons had been lying upon the ground. This evidence was objected to by the defendant, but the bill of exception in the record does not disclose the ground of the objection. It seems to have been admitted as evidence to corroborate the testimony of the prosecutrix. We are of the opinion that it should have been rejected in view of the peculiar circumstances of this case, and because it was too remote and uncertain in its character to have any legitimate bearing upon the issue, while it was well calculated to improperly influence the minds of the jury adversely to the defendant. If the ground had been examined recently after the alleged crime, and had presented the indications mentioned, such testimony would perhaps be admissible, but after the lapse of so long a time, and when ample opportunities had been afforded designing persons to fabricate these indications, it was of too questionable and dangerous a character to be thrown into the scales of justice against the life and liberty of a citizen.

It is the theory of the defense, and there is some evidence to support it, that the case against the defendant originated in the hatred and malice of the prosecutrix against him, and that the whole story of her outrage by him is false and fabricated. She discloses in her own testimony that, prior to this alleged outrage, she entertained bad feelings toward him; she charged him with being unkind to her, and with treating her badly and tyrannically. And she says that he was mad at her when he committed the outrage upon her. In view of her acknowledged unfilial feelings toward him; in view of the enormity and unnaturalness of the crime she charged against him; in view of the fact that she did not at once disclose to her mother and sister the fact of her injury; in view of the suspicion cast upon her testimony by the contradictory evidence of her mother and

sister, it was incumbent upon the prosecution to produce every fact and circumstance in evidence, however slight, which would corroborate her statements. But this was not done. It was in the power of the prosecution to corroborate her statement, if it was true, that the marks of the chol.ing were upon her neck. She says these marks remained for several days. Such corroboration would have been more cogent than any that was produced, because these marks could not easily have been fabricated. Their presence would have been strong evidence that she had been the victim of violence, and yet not a single witness is asked about them, so far as the record shows. Furthermore, no marks whatever of violence were observed upon her person by any one. It is reasonable to suppose that f she had been ravished as claimed,— deflowered of her maidenhood by violence,— her person and clothing would have exhibited some proof of it, and yet the record discloses no such evidence, and no attempt even to produce it.

As the case is presented to us, we cannot sanction the conviction and in view of all the surroundings of the case, we think the trial court erred in refusing the defendant's motion for a new trial.

There are other errors complained of by the defendant, but they are not such as are likely to occur on another trial, even if they be errors, and we have not therefore given them consideration.

Because the court erred in admitting illegal evidence, and because, in our opinion, the verdict is not supported by the evidence, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

[Opinion delivered December 10, 1884.]